FILED
05/23/2018
Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
February 22, 2018 Session

IN RE NEAMIAH R. ET AL.

Appeal from the Juvenile Court for Knox County
No. 162925     Timothy E. Irwin, Judge

No. E2017-02000-COA-R3-PT

In this action, the trial court terminated the respondent father's parental rights to his children, following its finding that clear and convincing evidence existed to establish the statutory grounds of (1) severe child abuse, (2) substantial noncompliance with the reasonable requirements of a permanency plan, and (3) failure to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the children. The court also determined by clear and convincing evidence that termination was in the best interest of the children. The father has appealed solely the best interest determination. Discerning no error regarding the statutory grounds for termination found by the trial court or the court's best interest analysis, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court
Affirmed; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR., and JOHN W. MCCLARTY, JJ., joined.

Matthew A. Robinson, Knoxville, Tennessee, for the appellant, Earl R.[1]

Herbert H. Slatery, III, Attorney General and Reporter, and Peako A. Jenkins, Assistant Attorney General, for the appellee, State of Tennessee Department of Children's Services.

---

[1] We note that following the filing of the appellate brief, Mr. Robinson withdrew as attorney of record for the appellant, who is now represented by Anna E. Corcoran.

**OPINION**

## I. Factual and Procedural Background

On June 5, 2017, the Tennessee Department of Children's Services ("DCS") filed a petition seeking to terminate the parental rights of Earl R. ("Father") to his three children: Neamiah, age five years; Major, age three years; and Mal'akhi, age nineteen months (collectively, "the Children"). DCS sought to terminate the parental rights of the Children's mother, Jennifer F. ("Mother"), via a separate proceeding. In the June 5, 2017 petition concerning Father's parental rights, DCS averred that it had been awarded temporary custody of the Children on August 2, 2016, following the Children's removal from their parents' custody due to nutritional and medical neglect, domestic violence, substance abuse, lack of supervision, inappropriate care, and failure to abide by safe sleep protocols. Specifically, DCS asserted that Mal'akhi had been hospitalized on May 26, 2016, after being diagnosed with severe failure to thrive. DCS further averred in the petition that on the day the Children were taken into custody, Mal'akhi was found alone on a bed in Mother's apartment while Mother visited with a neighbor and Neamiah and Major played outside unsupervised. Mother failed a drug screen administered on that day. Father appeared at the apartment while Mother was being interviewed and was arrested for domestic assault based on Mother's allegation that Father had hit her.

In the termination petition, DCS alleged that following a dependency and neglect hearing conducted on February 14, 2017, the trial court entered an order determining that Mal'akhi was the victim of severe abuse at the hands of both parents. DCS cited Father's testimony at the prior hearing, wherein Father reportedly stated that he was aware that Mal'akhi was underweight but that he nonetheless trusted Mother to take care of Mal'akhi. Father allegedly admitted that he failed to follow up on Mother's compliance with medical recommendations for Mal'akhi and that he "probably should have done more." Father reportedly acknowledged that he participated in the care of the Children but stated that he did not attend Mal'akhi's medical appointments.

DCS also alleged in its termination petition that Father had failed to substantially comply with the reasonable responsibilities set out in his permanency plan. According to DCS, a permanency plan had been developed on August 24, 2016, with Father's participation, which required that Father: (1) complete an alcohol and drug assessment and follow any resultant recommendations; (2) refrain from associating with drug users or dealers; (3) pass random drug screens; (4) address domestic violence in therapy or classes; (5) obtain and maintain safe, suitable housing; (6) complete parenting education through therapeutic visitation and follow the therapist's recommendations; and (7) complete a mental health assessment and follow resultant recommendations. Father was

also required to visit the Children regularly, maintain a legal source of income, pay child support, avoid criminal charges, and maintain contact with the DCS case manager.

With regard to these requirements, DCS acknowledged in the petition that Father had visited the Children, albeit not consistently, and had completed both substance abuse and mental health assessments. DCS asserted, however, that Father had failed to follow through with other requirements, including the recommendations from his assessments, and that he had recently tested positive for cocaine use.

DCS further alleged in the petition that Father had failed to "manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the children, and placing the children in [Father's] legal and physical custody would pose a risk of substantial harm to the physical and psychological welfare of the children." *See* Tenn. Code Ann. § 36-1-113(g)(14).

Following a bench trial conducted on October 5, 2017, the trial court entered an order terminating Father's parental rights to the Children on October 18, 2017. In its order, the court noted that it had previously entered an order determining that Mal'akhi had suffered severe abuse at the hands of both parents, following Mal'akhi's diagnosis of severe failure to thrive while in the parents' custody. The child's condition necessitated hospitalization. The court also stated that Father had testified during the dependency and neglect hearing that he was aware of Mal'akhi's low weight and that he should have done more to address the issue. The court further relied upon the testimony of Dr. Marymer Perales, an expert witness in the fields of pediatric emergency medicine and child abuse, who testified at the dependency and neglect hearing regarding failure-to-thrive infants. According to the court, Dr. Perales explained that malnutrition in infants carries many risks, including frequent illness, delayed brain growth, learning disabilities, and other mental health and cognitive issues. Dr. Perales also opined that improper monitoring of children who failed to thrive could ultimately result in death.

Based on these and other facts, the trial court determined that Father had committed severe child abuse against Mal'akhi. In addition, the court found that (1) Father had failed to substantially comply with the reasonable responsibilities of his permanency plan and (2) Father had failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the children, and placing the children in Father's legal and physical custody would pose a risk of substantial harm to their physical and psychological welfare. As the court elucidated:

> This case is remarkably simple. The severe abuse adjudication against [Father] is final and unappealed. [Father] completed the

3

assessments required by the permanency plan but then did not follow any of the recommendations. He came to some visits but not regularly and missed half of the therapeutic visits provided to increase his parenting skills. He did not participate in any domestic violence treatment and attacked another woman after the children entered foster care, resulting in his current incarceration. He had the opportunity to participate in those programs that could have put him on the road to recovery, but he did not cooperate. The Court liked his closing speech and liked his attitude. The Court believes that [Father] would like to change, but there is no evidence so far to that effect. The Court wished he had made those changes when it counted. The Court also wished he had not subjected his child to severe abuse and the risk of serious bodily injury or death.

With regard to best interest, the trial court analyzed the applicable statutory factors and made specific findings regarding the Children's best interest. After considering the factors and circumstances, the court determined by clear and convincing evidence that it was in the best interest of the Children to terminate Father's parental rights. Father timely appealed.

## II. Issue Presented

Father presents one issue for our review, which we have restated slightly:

Whether the trial court erred by determining that it was in the Children's best interest to terminate Father's parental rights.

## III. Standard of Review

In a termination of parental rights case, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed *de novo* upon the record, accompanied by a presumption of correctness unless the evidence preponderates against those findings. Tenn. R. App. P. 13(d); *see In re Carrington H.*, 483 S.W.3d 507, 524 (Tenn. 2016); *In re F.R.R., III*, 193 S.W.3d at 530. Questions of law, however, are reviewed *de novo* with no presumption of correctness. *See In re Carrington H.*, 483 S.W.3d at 524 (citing *In re M.L.P.*, 281 S.W.3d 393 (Tenn. 2009)). The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett,* 92 S.W.3d 835, 838 (Tenn. 2002).

"Parents have a fundamental constitutional interest in the care and custody of their children under both the United States and Tennessee constitutions." *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002). It is well established, however, that "this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)). As our Supreme Court has recently explained:

> The parental rights at stake are "far more precious than any property right." *Santosky*, 455 U.S. at 758-59. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of ["]severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(l)(1); *see also Santosky*, 455 U.S. at 759 (recognizing that a decison terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty, N.C.*, 452 U.S. 18, 27 (1981) (discussing the due process right of parents to fundamentally fair procedures).

> Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof—clear and convincing evidence. *Santosky*, 455 U.S. at 769. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

> * * *

> In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and

convincing evidence of the elements necessary to terminate parental rights.
*In re Bernard T.*, 319 S.W.3d at 596-97.

*In re Carrington H.*, 483 S.W.3d at 522-24. "[P]ersons seeking to terminate [parental] rights must prove all the elements of their case by clear and convincing evidence," including statutory grounds and the best interest of the child. *See In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010).

IV. Statutory Grounds for Termination of Father's Parental Rights

Tennessee Code Annotated § 36-1-113 (2017) lists the statutory requirements for termination of parental rights, providing in relevant part:

(a)   The chancery and circuit courts shall have concurrent jurisdiction with the juvenile court to terminate parental or guardianship rights to a child in a separate proceeding, or as a part of the adoption proceeding by utilizing any grounds for termination of parental or guardianship rights permitted in this part or in title 37, chapter 1, part 1 and title 37, chapter 2, part 4.

* * *

(c)   Termination of parental or guardianship rights must be based upon:

(1)   A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

(2)   That termination of the parent's or guardian's rights is in the best interests of the child.

Although Father did not appeal the trial court's determination that statutory grounds existed for termination of Father's parental rights, we will nonetheless address all grounds in our analysis due to the "importance of permanently placing children and the just, speedy resolution of cases." *See In re Angela E.,* 303 S.W.3d 240, 251 n.14 (Tenn. 2010). The trial court determined that three statutory grounds existed for termination of Father's parental rights: (1) severe child abuse, pursuant to Tennessee Code Annotated § 36-1-113(g)(4); (2) failure to substantially comply with the reasonable responsibilities set forth in the permanency plan, pursuant to Tennessee Code Annotated § 36-1-113(g)(2); and (3) failure to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of

the Children and placing the Children in Father's legal and physical custody would pose a risk of substantial harm to their physical and psychological welfare, pursuant to Tennessee Code Annotated § 36-1-113(g)(14). We will address each statutory ground in turn.

## A. Severe Child Abuse

Tennessee Code Annotated § 36-1-113(g)(4) provides the following as a statutory ground for termination:

> The parent or guardian has been found to have committed severe child abuse as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against the child who is the subject of the petition or against any sibling or half-sibling of such child, or any other child residing temporarily or permanently in the home of such parent or guardian . . . .

Tennessee Code Annotated § 37-1-102(b)(22) states in pertinent part:

"Severe child abuse" means:

(A)(i) The knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death and the knowing use of force on a child that is likely to cause serious bodily injury or death;

(ii) "Serious bodily injury" shall have the same meaning given in § 39-15-402(d).

(B) Specific brutality, abuse or neglect towards a child that in the opinion of qualified experts has caused or will reasonably be expected to produce severe psychosis, severe neurotic disorder, severe depression, severe developmental delay or intellectual disability, or severe impairment of the child's ability to function adequately in the child's environment, and the knowing failure to protect a child from such conduct;

(C) The commission of any act towards the child prohibited by § 39-13-309, §§ 39-13-502 -- 39-13-504, § 39-13-515, § 39-13-522, § 39-15-302, § 39-15-402, or § 39-17-1005 or the knowing failure to protect

7

the child from the commission of any such act towards the child . . . .

In its order terminating Father's parental rights, the trial court specifically found, *inter alia*:

> Following a hearing on February 14, 2017, this Court issued an order finding "that the child Mal'akhi [R.] is a victim of severe abuse at the hands of both parents pursuant to T.C.A. § 37-1-102(b)(22)(A), (B), and (C) due to the parents' medical and nutritional neglect, lack of supervision, and failure to abide by Safe Sleep protocols."

(Paragraph numbering omitted.) The referenced March 10, 2017 order was presented during trial as part of Collective Exhibit 2.

In the March 10, 2017 order, in which the trial court determined the Children to be dependent and neglected, the court thoroughly recounted the testimony of Dr. Perales regarding Mal'akhi's condition when the Children were brought into custody and the dangers faced by failure-to-thrive children. The court also detailed the testimony of the Child Protective Services investigator relating the unsuitable conditions in the family home at the time of the Children's removal, as well as the mother's testimony acknowledging her failure to follow up with a gastroenterologist regarding Mal'akhi's medical condition. Concerning Father's testimony at the February 14 hearing, the court found:

> Father took the stand and testified on his own behalf. Father testified that he knew of Mal'akhi's weight problems but trusted Mother to take care of it. Father stated that he and Mother "did what [they] were supposed to do" to address Mal'akhi's low weight but later admitted that he "probably should have done more" and failed to follow up on Mother's compliance with medical recommendations for the child. Father testified that he did not attend medical appointments for the child but would receive reports from Mother. Father testified that both he and Mother participated in the care of the children. Father could not name Mal'ahki's pediatrician and was not sure of the location of the physician's office.

Accordingly, in the March 10, 2017 order, the trial court concluded that Father had committed severe child abuse against Mal'akhi as defined in Tennessee Code Annotated § 37-1-102(b)(22).

It is well settled that a trial court may rely on a prior court order finding severe child abuse as a ground for termination and is not required to re-litigate the issue of

severe abuse during the termination trial, so long as the prior order is final. *See In re Shyronne D.H.*, No. W2011-00328-COA-R3-PT, 2011 WL 2651097, at *5 (Tenn. Ct. App. July 7, 2011); *State, Dep't of Children's Servs. v. M.S.*, No. M2003-01670-COA-R3-CV, 2005 WL 549141, at *10 (Tenn. Ct. App. Mar. 8, 2005). In the case at bar, the trial court found that the "severe abuse adjudication against [Father] is final and unappealed," and the record supports this finding. Therefore, the trial court did not err in relying upon the prior adjudication of severe child abuse in the dependency and neglect proceedings as a ground for termination of Father's parental rights. *See State, Dep't of Children's Servs. v. M.S.*, 2005 WL 549141, at *10 ("The [severe abuse] ground itself is proved by a court order finding severe child abuse, and the issue of whether abuse occurred is not re-litigated at the termination hearing.").

### B. Substantial Noncompliance with Permanency Plan

The trial court also determined that a statutory ground for termination existed because Father had failed to substantially comply with the reasonable responsibilities set forth in his permanency plan. Tennessee Code Annotated § 36-1-113(g)(2) provides as an additional ground for termination of parental rights:

> (2) There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to the provisions of title 37, chapter 2, part 4; . . . .

Upon our thorough review of the record, we conclude that clear and convincing evidence demonstrated that Father had failed to substantially comply with the reasonable responsibilities set out in the permanency plan. The permanency plan was entered as Exhibit 3 at the termination trial, and it provides that Father was responsible for, *inter alia*, the following requirements: (1) complying with all court orders; (2) cooperating with DCS and all service providers; (3) maintaining contact with the case manager at least twice per month; (4) paying $40 per month in child support; (5) obtaining a mental health assessment and following all resultant recommendations, including counseling and medication management if deemed necessary; (6) obtaining an alcohol and drug assessment and following all resultant recommendations; (7) submitting to and passing random drug screens; (8) completing parenting classes; (9) participating in therapeutic visitation and family support services, following through with all recommendations of the provider; (10) obtaining and maintaining suitable housing; (11) obtaining and maintaining a legal source of income; (12) attending domestic violence therapy or classes; and (13) avoiding new criminal charges.

The Children's DCS case manager, Edana Boney, testified at trial that Father had failed to complete most of the requirements of the permanency plan. Although Ms.

Boney acknowledged that Father had completed an alcohol and drug assessment, she stated that he failed to follow through with the recommendations and failed a subsequent drug screen, confessing to her that he had relapsed. Ms. Boney reported that Father had completed a mental health assessment, but he similarly failed to follow through with the resultant recommendations, including therapy. According to Ms. Boney, Father failed to participate in domestic violence counseling or classes and had recently incurred a new domestic violence charge, resulting in his incarceration at the time of the termination trial.

Ms. Boney further testified that Father had failed to establish a suitable home for the Children prior to his incarceration. With regard to visitation, Ms. Boney reported that Father had visited the Children sporadically, only attending approximately half of the scheduled visits. Ms. Boney also stated that Father's contact with her had likewise been sporadic at best. Finally, according to Ms. Boney, Father did not complete the parenting classes or the requirements of the therapeutic visitation.

Although Father did not testify under oath at the termination trial, the trial court allowed Father to make a statement at the conclusion of the hearing. In his statement, while Father apologized for his mistakes and asked to be given another chance, he did not refute the evidence regarding his lack of compliance with the permanency plan. Based on the proof presented at trial, we determine that the evidence does not preponderate against the trial court's determination that the statutory ground of substantial noncompliance with the reasonable requirements of the permanency plan had been proven by clear and convincing evidence.

C. Failure to Manifest an Ability and Willingness to Personally Assume Custody

The trial court also relied upon Tennessee Code Annotated § 36-1-113(g)(14) as a statutory ground for terminating Father's parental rights. This subsection, which was added to the statutory framework on July 1, 2016,[2] provides as an additional ground for termination:

> A legal parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

This Court has recently explained the following with regard to this ground for termination:

---

[2] *See* 2016 Tenn. Pub. Acts, Ch. 919 § 20 (S.B. 1393).

10

Essentially, this ground requires DCS to prove two elements by clear and convincing evidence. First, DCS must prove that [the parent] failed to manifest "an ability and willingness to personally assume legal and physical custody or financial responsibility of the child[ren]." Tenn. Code Ann. § 36-1-113(g)(14). DCS must then prove that placing the children in [the parent's] "legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[ren]." *Id.*

* * *

We have made the following observations about what constitutes "substantial harm":

> The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001) (footnotes omitted).

*In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *7-8 (Tenn. Ct. App. Apr. 4, 2018) (additional internal citations omitted).

In the case at bar, the evidence demonstrated that Father was incarcerated at the time of the termination trial and had failed to establish a suitable home for the Children prior to his incarceration. Moreover, Father had failed to complete most of the requirements of the permanency plan, which were aimed at helping him to establish a proper home. Most significantly, Father had failed to remedy his substance abuse problem, as shown by his positive drug screen at the last visit with the Children, and had failed to complete domestic violence classes or counseling. Based on the circumstances shown, we determine that Father had clearly failed to manifest an ability to personally assume legal and physical custody of the Children.

11

In addition, the evidence demonstrated that placing the Children in Father's legal and physical custody would pose a risk of substantial harm to their physical and psychological welfare. Because Father had failed to follow through with the recommendations of his substance abuse assessment, he had not remedied his addiction issues and appeared at the last visit with the Children while under the influence of cocaine. Further, Father had not addressed the domestic violence issue and had recently committed domestic violence against another victim, resulting in his incarceration at the time of trial. Ms. Boney testified that the Children had been hesitant to visit with Father before his incarceration and often recounted Father's violent acts against Mother, which occurred before DCS brought the Children into custody. Thus, placing the Children with Father would expose the Children to a substantial and probable risk of living in a home with drug use and domestic violence. *See, e.g., In re Maya R.*, 2018 WL 1629930, at *8.

Based on the evidence presented, we conclude that DCS proved by clear and convincing evidence that Father failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the Children and that placing the Children in Father's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the Children. Accordingly, we affirm the trial court's findings regarding the existence of statutory grounds for termination.

## V. Best Interest of the Children

Father argues that the trial court erred in its determination that terminating his parental rights was in the best interest of the Children. When a parent has been found to be unfit by establishment of at least one statutory ground for termination of parental rights, as here, the interests of parent and child diverge, and the focus shifts to what is in the child's best interest. *See In re Audrey S.*, 182 S.W.3d at 877; *see also In re Carrington H.*, 483 S.W.3d at 523 ("'The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination.'") (quoting *In re Angela E.*, 303 S.W.3d 240, 254 (Tenn. 2010)). Tennessee Code Annotated § 36-1-113(i) provides a list of factors the trial court is to consider when determining if termination of parental rights is in a child's best interest. This list is not exhaustive, and the statute does not require the court to find the existence of every factor before concluding that termination is in a child's best interest. *See In re Carrington H.*, 483 S.W.3d at 523; *In re Audrey S.*, 182 S.W.3d at 878 ("The relevancy and weight to be given each factor depends on the unique facts of each case."). Furthermore, the best interest of a child must be determined from the child's perspective and not the parent's. *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004).

Tennessee Code Annotated § 36-1-113(i) lists the following factors for consideration:

(1)     Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2)     Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3)     Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4)     Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5)     The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6)     Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7)     Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8)     Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

> (9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

As our Supreme Court recently elucidated regarding the best interest analysis:

"The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." In re Angela E., 303 S.W.3d at 254.

When conducting the best interests analysis, courts must consider nine statutory factors listed in Tennessee Code Annotated section 36-1-113(i). These statutory factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis. In re Carrington H., 483 S.W.3d at 523 (citing In re Audrey S., 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)). Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." In re Kaliyah S., 455 S.W.3d at 555 (citing In re Audrey S., 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." Id. When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." In re Audrey S., 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. Id. "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child . . . ." Tenn. Code Ann. § 36-1-101(d) (2017).

Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. In re Audrey S., 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. White v. Moody, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. See In re Audrey S., 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are

14

terminated.  In re Carrington H., 483 S.W.3d at 523.  "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis."  In re Audrey S., 182 S.W.3d at 878 (citing White v. Moody, 171 S.W.3d at 194).  But this does not mean that a court is relieved of the obligation of considering all the factors and all the proof.  Even if the circumstances of a particular case ultimately result in the court ascribing more weight—even outcome determinative weight—to a particular statutory factor, the court must consider all of the statutory factors, as well as any other relevant proof any party offers.

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017).

In the case at bar, the trial court determined that DCS had presented clear and convincing evidence demonstrating that termination of Father's parental rights was in the best interest of the Children.  We agree.  Considering the above-listed factors, the trial court found that Father had not made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the Children's best interest to be in his home, despite reasonable efforts by DCS.  The court noted that Father was incarcerated at the time of the termination hearing due to a domestic violence charge that occurred after the Children were taken into custody and that Father had further failed to establish a home before his incarceration.  The court also determined that Father had not maintained regular visitation with the Children before his incarceration.  As a result, the court found that Father had no meaningful relationship with Mal'akhi and that whatever relationship he did have with the older boys had been diminished by his absence.  The court also noted that Father was found to be under the influence of illicit drugs during his last visit with the Children.

The trial court further determined that a change of caretakers would have a detrimental effect on the Children.  The court found that the Children were "on the edge of disaster" when they came into custody, with Mal'akhi weighing only ten pounds at fourteen months of age.  The court found that the older boys were "out of control, cussing and fighting, not able to sleep."  At the time of trial, however, the court found that the older boys were well integrated into their foster family "where verbal and physical aggression are not the norm," had friends, and slept well.  The court similarly determined that Mal'akhi appeared to be happy and healthy and was, at the time of trial, at the thirty-fifth percentile for weight and the fiftieth percentile for height.  The court further noted that the Children had an opportunity to achieve permanency through adoption.

Following our thorough review of the evidence presented, we conclude that the trial court's findings were supported by a preponderance of the evidence.  Ms. Boney testified at length regarding Father's circumstances, demonstrating that Father had failed

to obtain or maintain a suitable home for the Children before his incarceration. At the time of trial, Father was serving a sentence for domestic assault and had not visited the Children since May or June when he tested positive for cocaine use during the visit. Ergo, there was no proof that Father had made any adjustment of his circumstances such that it would be safe or in the Children's best interest to be in his care, despite efforts to assist Father by DCS.

Although Father had visited the Children, his visits were irregular and sporadic, and no visits had occurred for the few months prior to the termination trial. Ms. Boney testified that although the Children seemed to enjoy their visits with Father when visits did occur, they did not cry upon leaving. She recounted that the older boys were often reluctant to visit with Father and recalled his abuse of Mother. As such, no evidence existed demonstrating that Father maintained a meaningful relationship with the Children.

With regard to whether the Children would be detrimentally affected by a change of caretakers and environment, the Children's foster mother testified during trial, describing the Children as "bonded" with her family. The foster mother also affirmed that the foster parents wanted to adopt the Children.

The Children's foster mother explained that when the Children came into custody, the older boys had significant behavioral issues. She described the older boys as aggressive, angry, defiant, "throwing fits," and unable to sleep. According to the foster mother, the family had instituted the use of disciplinary time-outs in addition to rewards for good behavior and had worked on the Children's social skills. She reported that by the time of trial, the older boys were doing well in school and preschool, had many friends, slept well, exhibited appropriate behavior and coping skills, and followed direction.

The foster mother related that Mal'akhi was severely underweight when he came to their home, requiring the foster parents to feed him frequently, administer medication for reflux, and take him to numerous medical appointments. She reported that Mal'akhi had gained an appropriate amount of weight by the time of trial, with his weight having increased to twenty-six pounds. The foster mother stated that Mal'akhi was, at that time, no longer considered a failure-to-thrive child.

According to both the foster mother and Ms. Boney, the Children were thriving in their foster home. Ms. Boney testified that she visited the Children in the home at least twice per month and further reported that the Children were "well-integrated" into the foster family. Ms. Boney also related that the Children's behavior had greatly improved

and that they were all doing well. Ms. Boney opined that it would be detrimental to the Children to remove them from their foster home.

Concerning the remaining factors, the evidence presented at trial demonstrated that Father had been abusive toward Mother as well as toward another unidentified victim, resulting in his current incarceration. In addition, Father had tested positive for cocaine use during his last visit with the Children. As such, Father had not demonstrated that he could care for the Children in a safe, stable manner. No evidence was presented regarding whether Father had paid child support.

Based on our review of the evidence in light of the statutory factors, we conclude that the trial court did not err in finding clear and convincing evidence that termination of Father's parental rights was in the best interest of the Children. We therefore affirm the trial court's termination of Father's parental rights.

## VI. Conclusion

For the reasons stated above, we affirm the judgment of the trial court terminating the parental rights of Father in all respects. Costs on appeal are taxed to the appellant, Earl R. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment and collection of costs assessed below.

_____
THOMAS R. FRIERSON, II, JUDGE